WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Matthew Hogle; Charlene Anne Hogle; Harold Bruce Hogle, Jr.; and Kimberly Rae Hogle,<br><br>Appellants,<br><br>v.<br><br>Gary Smestad; Big Sky South; Douglas Sill; Sharon Sill; Papadeas Revocable Living Trust; Erika Papadeas; Nathan Papadeas; Peter Warbalow; Wesley Keeley; Marshall Jones; Walter Malone; Ann Voelker; Roscoe Enterprises LLC; and Cedar 1 LLC,<br><br>Appellees. | No. CV-13-01057-PHX-GMS<br><br>**ORDER** |

Frank, Charlene, Harold and Kimberly Hogle ("The Hogles" or alternatively "Appellants") appeal a grant of summary judgment entered against them by the U.S. Bankruptcy Court of the District of Arizona in the amount of $1,600,000.00. The judgment determines that no material questions of fact exist, that appellants are liable for multiple violations of the Arizona state securities fraud statute (A.R.S. § 44-1991), and that the judgment amount is non-dischargeable in bankruptcy. For the reasons set forth below, that judgment is vacated and the case is remanded to the bankruptcy court for further action consistent with this opinion.

**BACKGROUND**

The bankruptcy court entered the appealed judgment in favor of the Plaintiffs as a result of the Plaintiff's investment in a medical imaging company started by the Hogles

called True Imaging LLC ("True Imaging").  True Imaging was to receive patients as referrals from a network of physicians and insurance companies.  (*Id.*)

The Hogles sought to raise $8,000,000 in equity financing for True Imaging through "Accredited Investors," meaning investors that had a net worth of over $1,000,000 and an annual income of over $200,000. (Doc. 10 at 6.)  With such investors, the Hogles could rely on the private placement exemption from securities registration requirements. (*Id.*) The Hogles prepared a Private Placement Memorandum ("PPM"), dated May 1, 2007, which was shared with potential investors, including Plaintiffs.  (*Id.*) The PPM was later supplemented on July 12, 2007 (the "PPM Supplement").  (Doc. 10 at 11.)   In connection with the securities offering the Hogles also produced a three-page document entitled "The Opportunity" ("Business Opportunity Document") (BK Adversary Proceeding 2:11-ap-01205-SSC ("BK Record"), Doc. 29-5)  and an executive summary for True Imaging ("Executive Summary") (BK Record, Doc. 29-6.  The Hogles also met personally with all the investors or their representatives. (Doc 10 at 11.) The Hogles raised only $2,647,390 of the eight million dollars they sought to raise.  (Doc. 10 at 6.)  Plaintiffs contributed $1,600,000 of that amount.  (Doc. 10 at 4.)

True Imaging had multiple ties with the Hogles personally, and with a company solely owned by the Hogles called Hogle Brothers, LLC ("HB LLC").  True Imaging was managed by HB LLC, which in turn hired a third party to manage the company.  (Doc. 10 at 4.)  True Imaging also operated out of a building owned by HB LLC and paid rent to HB LLC. (*Id.*)    Matt Hogle initially planned to occupy the other half of the building as a location for his chiropractic practice.  (*Id.*)  HB LLC financed the building which was secured in part by the Hogles' personal guarantees.  (Doc. 10 at 5.)

HB LLC also financed the acquisition of imaging equipment for True Imaging through loans guaranteed by both HB LLC and the Hogles, personally.  (*Id.*)  HB LLC financed an MRI machine, CT machine, mammography machine, and other equipment. In addition, True Imaging desired, but never actually obtained, an MRgFUS machine, used for cancer detection, because of insufficient financing.  The MRgFUS machine was

priced somewhere between $2,000,000 (Doc 10 at 5) and $3,200,000 (BK Record, Doc. 29-6 at 4).

True Imaging earned gross revenues of $283,368 in 2008, (Doc. 10 at 4.), and $751,323 in 2009. (*Id.*) However, these sums were insufficient to cover both its operating costs and debt service. (*Id.*) Thus, an equipment lender commenced collection actions and True Imaging was forced to cease operations. (*Id.*) HB LLC lost the real estate it owned and the Hogles took out individual Chapter 7 Bankruptcies. (*Id.*) The bankruptcy court, after both parties agreed to submit to its jurisdiction for the case (BK Record, Doc. 54), granted summary judgment in favor of the Plaintiffs based on what it determined to be seven material omissions or representations either made by the Hogles personally or found in the offering documents that the Court found to violate the requirements of the Arizona Securities Act. A.R.S. § 44-1991. (Doc. 1.) The bases of the bankruptcy court's grant of summary judgment are the following:

1. The failure to disclose Matt Hogle's disciplinary history with the Board of Chiropractors.
2. The failure to disclose the Hogles' lack of experience in managing a medical imaging center.
3. The failure to disclose that HB LLC would charge True Imaging rent of $18,000 per month.
4. That True Imaging either already had the MRgFUS, or had the ability to acquire the MRgFUS.
5. That True Imaging would purchase medical imaging equipment, place the purchasing of medical equipment first in a list of intended use of investors' proceeds, and make clear that the purchase of medical imaging equipment was central to the business objectives of True Imaging.
6. That Plaintiffs' funds would be held in a segregated account and would not be accessed until True Imaging either purchased medical equipment or entered into a lease.

7. That True Imaging had separate legal counsel when actually the attorney who authored the PPM represented the Hogles in their individual capacity.

Because a finding of merely one violation of A.R.S. § 44-1991 is sufficient for a finding of non-dischargability under 11 U.S.C. § 523(a)(19), the Court will address each of these findings in turn.

## LEGAL STANDARD

A bankruptcy court's order granting summary judgment is reviewed on appeal *de novo*. *Barboza v. New Form, Inc.*, 545 F.3d 702, 707 (9th Cir. 2008). Summary judgment should be affirmed only when no genuine issue of material fact exists. *Id.* An issue of fact "is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under governing law." *Id.* Thus, if there is sufficient evidentiary basis in the record upon which a reasonable finder of fact could find for the Defendants under the governing law, summary judgment is improper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 n.2, (1986).

It is a violation of A.R.S. § 44-1991 to "[m]ake any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in the sale of a security. (*Id.*) However, "there is no duty to disclose information simply because it is material. Instead, an omission is actionable only if it affirmatively creates an impression of a statement of affairs that differs in a material way from the one that actually exists." *Allstate L.I. Co. v. Robert W. Baird, et al.*, 756 F. Supp. 2d 1113, 1130 (D. Ariz. 2010). Thus, "the plaintiff must explain how (an) alleged omitted fact negates the truth of or renders misleading statements actually made" *Id.* (citations omitted).

Interpretation of A.R.S. § 44-1991 is not identical to federal securities laws, though the Supreme Court of Arizona has stated that "for consistent application of the law" they "will follow the reasoning" of federal courts "in interpreting sections of our statutes which are identical or similar to federal securities statutes." *State v. Gunnison*,

127 Ariz. 110, 113, 618 P.2d 604, 607 (1980). For our purposes, "Section 44-1991(A) is almost identical to the antifraud provisions of the 1933 Securities Act, 15 U.S.C.A. § 77q." *Grand v. Nacchio*, 225 Ariz. 171, 173 236 P.3d 398, 400 (2010).

## ANALYSIS

### A. The Court's Determinations as to Material Omissions.

As a general matter, whether a statement or omission is material is a question of fact. *In Re Allstate Life Ins. Co. Litigation,* ___F.Supp.2d. ___, 2013 WL 5161130 at *6 (Sept. 13, 2013) *citing Siracusano v. Matrixx Initiatives, Inc.,* 585 F.3d 1167, 1178 (9th Cir.2009), *aff'd,* ––– U.S. ––––, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). As this Court observed in *Allstate* "[a]n issue of materiality can be resolved as a matter of law only when 'omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality.' *Id.* (internal quotations omitted) (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). In defining materiality, the Arizona Court of Appeals has held that a statement or omission need not be material to "this particular buyer" but rather that it "would have assumed actual significance in the deliberations of a *reasonable* buyer." *Aaron v. Fromkin,* 196 Ariz. 224, 227, 994 P.2d 1039, 1042 (Ct. App. 2000) (emphasis added). A material omission is one that *makes misleading* the information that has already been provided. *See*, *In re Allstate*, *supra*.

### 1. Matt Hogle's disciplinary history with the Board of Chiropractors.

The Bankruptcy Court determined as a matter of undisputed fact that the Hogles' failure to disclose Matt Hogle's disciplinary history with the Arizona State Board of Chiropractic Examiners (the "Board") was a material omission under A.R.S. § 44-1991.

Matt Hogle is a licensed chiropractor who voluntarily entered into a "Consent Agreement for Letter of Concern and Probation" ("Consent Agreement") with the Board in November 2005. (BK Record, Doc. 29-17.) The Consent Agreement states that Matt Hogle had treated a patient for whom there was insufficient documentation for charges that Hogle billed to the patient. However, the Board noted specifically that "there

1 appears to be no intent to defraud." (*Id.* at 7.)  The Consent Agreement required Hogle to
2 take continuing education classes in "history taking" and "coding and billing." (*Id.* at 7.)
3 During his probationary period he was required to undergo audits of his chiropractic
4 office records. (*Id.*)

5 In *Strategic Diversity Inc. v. Alchemix Corp.*, 666 F.3d 1197 (9th Cir. 2012) the
6 Ninth Circuit held it was *not* a material omission for a defendant to fail to disclose to
7 potential investors that he was a defendant in a securities fraud case.  The bankruptcy
8 court, in nevertheless granting summary judgment against the Hogles on materiality
9 grounds, attempted to distinguish this case because the defendant in *Strategic Diversity*
10 had not yet had a judgment entered against him and because the securities fraud case
11 pending against him involved a different company than the one in whose securities
12 offering he failed to mention the lawsuit.  However, Matt Hogle's Consent Agreement
13 also did not involve the same company as the one in whose securities offering he failed to
14 mention the disciplinary action.  Also, Matt Hogle's Consent Agreement did not
15 determine or allege that he was liable for securities or any other type of fraud.   Indeed,
16 the Consent Agreement specifically found an absence of fraud. (BK Record, Doc. 29-17
17 at 7.)

18 It is not apparent to this Court that the Consent Decree which found no fraud
19 "would have assumed actual significance in the deliberations of a reasonable buyer,"
20 *Aaron* 196 Ariz. at 227, 994 P.2d at 1042.  There appears to be no element of the stated
21 materials that would be made misleading by the omission of the Consent Agreement; e.g.,
22 Plaintiffs have not pointed to any solicitation materials or statements that imply that Matt
23 Hogle had never had disciplinary action taken against him.  Therefore this omission,
24 while potentially material is not "so obviously important to an investor, that reasonable
25 minds cannot differ on the question of materiality." *Allstate* 2013 WL 5161130 at *6.
26 The Court therefore finds that summary judgment under A.R.S. § 44-1991 for the failure
27 to disclose the Consent Agreement was inappropriate.

28

**2.    The Hogles' lack of experience in managing a medical center.**

The bankruptcy court further found that it was a material omission that the Hogles did not disclose that they had no previous experience running a medical imaging company. But, the Hogles never did run True Imaging. Nor did they ever represent that they would do so. Instead, they hired a person with experience to run the operation while it was a going concern. (Doc. 10 at 4.)

It is undisputed that the PPM does not provide any information about the Hogles' background. (Doc. 13 at 9.) Nor did it suggest that the Hogles had any experience running a medical imaging company. A.R.S. § 44-1991 requires that the material omission must *make misleading* the things which were actually stated. It would arguably be a material issue if the Hogles left the impression that they had experience running a medical imaging company, when actually they did not. However, there is no such claim. Indeed, it is undisputed that the Hogles met individually with each plaintiff or their representative. (Doc. 10 at 11.) Defendants have submitted an affidavit claiming that each plaintiff knew the background of the Hogles. (*Id*; BK Record Doc. 45 at 11)

When there is no apparent question that the Hogles ever actually operated True Imaging while it was in business, the fact that they did not tell investors that they had no experience in doing so, is not so material as to be an omission that is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Allstate* 2013 WL 5161130 at *6. Therefore this failure to disclose was not proper grounds for summary judgment under A.R.S. § 44-1991.

**B. The Court's Determinations as to Material Misrepresentations**

In granting summary judgment the bankruptcy court determined that several statements made by the Defendants were violations of A.R.S. § 44-1991 (A) (2) in that they were "untrue statements" "of material fact." This language is identical to the standard used in determining the existence of a federal securities violation under 1933 Securities Act. *Grand*, 225 Ariz. at 173, 236 P.3d at 400. Nevertheless while federal securities violations require knowledge of the falsity of the statement, the Supreme Court

of Arizona has held that "scienter is not an element of a violation of A.R.S. § 44-1991(2)." *State v. Gunnison*, 127 Ariz. 110, 113, 618 P.2d 604, 607 (1980).

However, the untrue statement must be one of present fact, not a prediction or opinion about the future. "[I]n the case of a prediction as to the future," the fact that the prediction turned out later to be false "in itself does not make the statement untrue when made." *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 490 (9th Cir. 1974). In contrast to statements of historical fact, "[i]nformation that inherently involves some subjective analysis or extrapolation, such as projections, estimates, opinions, motives, or intentions is soft information which is generally not required to be disclosed." *Caruthers v. Underhill*, 230 Ariz. 513, 524, 287 P.3d 807, 818 (Ct. App. 2012) (internal citations omitted). In one case, certain statements about the future state of the company were held as a matter of law to not constitute securities violations because such "statements [were] predictions as to future events; none [were] statements as to present facts, let alone guarantees." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994). Indeed, "an inability to foresee the future does not constitute fraud, because "[t]he securities laws approach matters from an ex ante perspective". *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1132 (7th Cir. 1993) (quoting *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) (stating that "a statement true when made does not become fraudulent because things unexpectedly go wrong")).

### 1. HB LLC charging True Imaging rent of $18,000 per month.

The bankruptcy court held that the Hogles violated A.R.S. § 44-1991 when they stated that True Imaging would pay to HB LLC a certain amount of rent under the lease and it later paid a greater amount of rent. The initial PPM included a proposed lease that put True Imaging's base rent at $6625 per month, gradually increasing year by year. (BK Record, Doc 29-10 at 7.) The PPM Supplement, issued due to projected changes in the make-up of True Imaging's premises, proposed that the base rent would be $11,000 per month. (Doc. 10 at 11-12.) The actual lease entered into between True Imaging and HB LLC charged $18,000 for monthly rent. (BK Record Doc. 29-12.) Nevertheless, the

proposed rental amounts in the PPM and PPM Supplement were not statements of fact. Rather, they were speculation about the future.

The portion of the PPM relevant to rent is Section 7.3 (BK Record Doc. 29-8 at 23), entitled "Proposed Lease with HB LLC." This section states that "[True Imaging] has received a non-binding lease proposal from HB LLC." The entire Proposed Lease was attached as Exhibit B to the PPM (Doc. 29-10). Section 7.3 of the PPM included several key terms from the Proposed Lease. Among these was rent. It stated that: "The annual rent for the first year shall be approximately $79,500 (about $29.50 per rentable square foot)." (BK Record Doc. 29-8 at 23.) In the full lease terms contained in Exhibit B, this "base rent" was more fully broken down by month and extended out for five years. (BK Record Doc. 29-10 at 7.) Section 7.3 of the PPM also explicitly states that in addition to this base rental amount, "True Imaging will be responsible for all leasehold improvements to the Premises where the Facility is located." (BK Record Doc. 29-8 at 24.) The final paragraph of the Section 7.3 emphasizes the uncertain nature of the proposed lease terms, explicitly stating: "There may be no assurance that HB LLC will enter into a lease with [True Imaging] that contains the Proposed Lease terms described above." (*Id.*) It continues to say: "Additionally, in the event [True Imaging] does enter into such a lease, the lease will contain terms in addition to the Proposed Lease Terms. Such additional terms will be at the discretion of the Company's Manager." (*Id.*)

The PPM Supplement was issued two and half months after the PPM, the entire purpose of which was to revise Sections 7.2 and 7.3 of the PPM, which related to the proposed premises and rental agreement for True Imaging. (BK Record Doc. 29-11.) The PPM Supplement was issued before any Plaintiffs invested in True Imaging.[1] The PPM Supplement deleted Section 7.2 (the description of the imaging center) in its entirety and replaced it with a section which doubled the square footage contained in the

---

[1] The first Plaintiff to invest was Gary Smestad, who made an investment on July 23, 2007. (BK Record Doc. 41 at 10, ¶ 69; Ex. 1 and 15.)

- 9 -

original PPM. The revised Section 7.2 also reinforced the speculative nature of the Proposed Lease and its terms:

> Because improvements on the real estate on which the Imaging-Center is located are not complete, it is difficult to describe with particularity the exact design, lay-out or physical make-up of the Imaging-Center. Additionally, as described in Section 7.3, there may be no assurance that HB LLC will ever enter into a lease with [True Imaging].

(BK Record Doc. 29-11 at 2.)

The PPM Supplement also replaced the "Rent" section of Section 7.3 of the PPM. The replacement paragraph stated: "The annual rent for the first year shall be approximately $132,750 (about $29.50 per rentable square foot)." This amount is consistent with the price per rentable square foot in the original PPM.

The fluidity of the lease and its terms are evidenced by the increase in proposed rent from $6625 per month in the original PPM to $11,000 per month in the PPM Supplement (Doc. 10 at 13.), all of which occurred before any Plaintiffs invested in True Imaging. The PPM Supplement shows the rent changed because the plans for True Imaging's building changed. (BK Record Doc. 29-11 at 2.) It became apparent that the operating space needed for True Imaging was double what was originally anticipated, requiring True Imaging to occupy the entire building rather than share it with Matt Hogle's chiropractor business. (*Id.*)

Additionally, Defendants also set forth facts demonstrating that before signing the lease, HB LLC made over $600,000 worth of improvements to the property that True Imaging was to occupy, which they assert they needed to recover through increased rents. (BK Record, Doc. 41 at ¶ 54-58.) True Imaging was required, per the PPM, to cover the cost of the improvements to the property beyond $120,000. (BK Record, Doc 29-10 at 6, Section 4.2; BK Record, Doc 29-10 at 35, Exhibit B to Proposed Lease Section 7(b).) Defendants claim True Imaging still owed them over $170,000 for tenant improvements at the time of entering into the lease. (BK Record, Doc. 41 at ¶ 54-58.), and the increased rent was intended to recoup these improvement costs from True Imaging. There is no

1   disagreement from Plaintiffs that this money was owed by True Imaging to HB LLC. There also appears to be no provision of the PPM or PPM Supplement forbidding True Imaging from recouping tenant improvement costs through additions to the base rent set forth in the Section 7.3 of the PPM and revised via the PPM Supplement.

This is reasonable evidence of the speculative, rather than concrete, nature of the Proposed Lease and its terms. A reasonable fact-finder could conclude based on the above that the lease figures presented in the PPM ($6625 per month) and PPM Supplement ($11,000 per month) were not "historical" or "verifiable" facts, but rather projections about the future needs of the business, and therefore not actionable "misstatements of fact."

> **2.    The Hogles represented to the Plaintiffs that they either had the MRgFUS or had the ability to acquire the MRgFUS, yet never acquired the MRgFUS.**

It is not in dispute that in marketing materials for the securities offering, the Hogles touted the MRgFUS machine as a significant potential asset to True Imaging. However, there is at least a question of fact as to whether the various statements touting the usefulness of the MRgFUS machine ever left the impression with a reasonable investor that the Hogles already possessed an MRgFUS machine, or would certainly acquire one in the future.  And no claims were made that True Imaging already had the ability to acquire the machine.

In the Business Opportunity Document, the Hogles list the MRgFUS under their list entitled "Our Equipment."  At first glance this statement without context could give the impression that True Imaging already possessed an MRgFUS.  However, as the Business Opportunity Document itself makes clear, the entire purpose behind the securities offering was to raise money to start the new company and buy all the necessary items needed for the company to run.  (Doc. 10 at 13.)  As a result, it refers to the anticipated business in the present tense.  For example, the Business Opportunity Document, itself only three pages long, also states: "We offer instant images available to the referring physician;" (*Id.* at 3) "We have a certain marketing niche;" (*Id.*) and "We

- 11 -

1  utilize RPA's (Radiology Physician Assistants)" (*Id.* at 4).  In perspective then, there is
2  an issue of fact about whether any statement in the Business Opportunity Document
3  makes a misstatement that True Imaging already has an MRgFUS machine.

4  The Defendants also point to other statements in the offering documents as
5  evidence demonstrating that the present-tense language of the Business Opportunity
6  Document did not, in fact, mean that True Imaging already possessed an MRgFUS
7  machine.  The Executive Summary to the PPM also touts the MRgFUS machine, though
8  clearly as a future acquisition.  The Executive Summary, states that "[w]e are poised and
9  ready to help bring" the treatments offered by the MRgFUS "to the mainstream."  (BK
10 Record, Doc. 29-6 at 4.)  The Executive Summary also later lists the equipment True
11 Imaging will have and states: "And of course we *will* have the [MRgFUS]. (*Id.* at 6.)
12 (emphasis added)

13 The risk that the MRgFUS machine would not receive FDA approval was also
14 stated in the Defendants' offering materials.  Specifically, the Business Opportunity
15 Document states that the MRgFUS "is currently FDA approved for the treatment of
16 uterine fibroids, and should be approved by October 2007 for the treatment of Breast
17 cancer and Prostate cancer."  (BK Record, Doc. 29-5 at 3.)  The Executive Summary
18 makes the same statement.  (BK Record, Doc. 29-6 at 3.) It also makes clear that the
19 cancer treatment uses of the MRgFUS will be especially novel and marketable,
20 comprising much of the value of the machine.  (*Id.* at 4.)  As this Court has held,
21 "forward-looking statements are not actionable if they are accompanied by sufficient
22 cautionary language that warns of specific risks that may prevent a projection, estimate,
23 or expectation from materializing." *Allstate v. Baird* 756 F. Supp. 2d 1136, *supra*.

24 The PPM states that though True Imaging "presently intends that the proceed from
25 the Offering will be used to purchase medical imaging equipment," such as the MRgFUS,
26 "the utilization of the proceeds of this Offering is at the discretion of the Company's
27 Manager and may change based on events that occur during or after this Offering." (Doc.
28 10 at 14.)   The Executive Summary also lists the price of the equipment to be purchased,

including the MRgFUS machine, which is listed as costing $3,200,000 by itself, over half the amount estimated for all the company's equipment purchases. ((BK Record, Doc. 29-6 at 4.) The total price for all seven pieces of equipment listed is stated to be "approximately $5 million." (*Id.*) In the end, however, the Hogles only ended up raising just over $2.5 million in equity financing when their stated goal was $8 million. (Doc. 10 at 6.)

The multiple statements and uncertain prognostication for the MRgFUS raise material factual questions as to whether these statements regarding the MRgFUS were in fact a misrepresentation that True Imaging presently possessed an MRgFUS machine or that they would acquire one.

### 3. The statements in the PPM that True Imaging would purchase medical imaging equipment.

The bankruptcy court held that it was a material misrepresentation for the Hogles to represent that True Imaging would purchase medical imaging equipment when it never did so, but in fact the equipment was acquired by HB LLC. (BK Record, Doc. 54 at 14.) The PPM, Business Opportunity Document, and Executive Summary all discuss the medical equipment that was central to True Imaging's business plan. Defendants do not dispute that their statements insisted that True Imaging would acquire medical equipment, but instead argue that True Imaging actually did acquire medical equipment. (Doc. 10 at 16.)

Defendants concede that the financing for the equipment could not be done in True Imaging's name because it was a start-up company with no assets or credit history. (Doc. 10 at 6.) However, Defendants assert that the $2,345,613 in medical equipment acquired in the name of HB LLC belonged to True Imaging. They offer several facts to support that assertion.

First, the equipment was listed on the balance sheets from True Imaging. (Doc. 10 at 16). The PPM explicitly states the possibility that equipment belonging to True Imaging may be acquired in another entity's name. (*Id.*) Exhibit A (entitled "The Operating Agreement) of the PPM states that the Manager of True Imaging:

- 13 -

> may cause title [to Company property] to be acquired and held in the Manager's name or in the names of trustees, nominees, or straw parties for the Company; provided, however, that the Company's books and records shall clearly reflect that the Company is the beneficial and true owner of such Property. It is expressly understood and agreed that the manner of holding title to the Company's Property (or any part thereof) is solely for the convenience of the Company and that Property shall be treated as Company Property; and if held by a person other than the Company, the Property shall be deemed to be held in trust for the benefit of the Company.

(BK Record, Doc. 29-9 at 11-12.)

Second, the equipment was used by True Imaging for two years, and generated approximately $1 million in revenue during that period, and yet there is no suggestion that True Imaging paid rent to any entity for the use of the equipment. (*Id.* at 4.) There appears to be evidence, then, sufficient to raise an issue of fact as to whether True Imaging was the beneficial owner of medical imaging equipment, which was in accordance with the representations made to Plaintiffs.

Part of the reason for the lack of evidentiary development of this issue is that this argument was not briefed by the parties, but was only brought up at oral argument by the Bankruptcy Judge. (BK Record, Doc. 54 at 14.) Thus, there is no evidence produced by either party about the legal owner of the equipment and no evidence to suggest that the equipment was wrongly placed on the True Imaging balance sheet. Because Defendants have submitted sufficient evidence to create a material issue of relevant fact as to the ownership True Imaging's equipment, summary judgment on this issue was inappropriate.

### 4. Hogles' representation that Plaintiffs' funds would be held in a segregated account and not be accessed until True Imaging either purchased medical equipment or entered into a lease.

The bankruptcy court held that it was a material misrepresentation that the Hogles told the Plaintiffs that their investments would be held in a segregated account and would not be accessed until True Imaging either purchased equipment or entered into a lease.

- 14 -

1  The bankruptcy court found that more than $340,000 of Plaintiffs' funds were spent
2  months before either of those events occurred.  The PPM states that Plaintiffs' funds
3  could be released from the segregated account when either (1) a lease with Hogle
4  Brothers went into effect, or (2) True Imaging acquired "certain medical imaging
5  equipment." (Doc. 10 at 14.)  The lease with HB LLC had not taken effect when True
6  Imaging paid HB LLC $340,000 in 2007 for improvements to the building to be leased.
7  (*Id.*)  The bankruptcy court held that because True Imaging did not purchase any medical
8  equipment (rather, HB LLC purchased it), the payment of $340,000 in 2007 was a
9  violation of this representation. (BK Record, Doc 54 at 12.)

As laid out above, there is a genuine issue of material fact as to whether True Imagining owned medical equipment in a way contemplated by the PPM, making summary judgment on this issue inappropriate on that basis.

Additionally, the Defendants have also offered evidence that the $340,000 paid in 2007 was not Plaintiffs' money, but rather came from $400,000 raised from two investors, John Donahue and Dean Taylor, who invested before Plaintiffs and whose investment did not include this release restriction.  (Doc. 10 at 15.)  They provided an affidavit to this effect from Matt Hogle as well as a balance sheet from 2007 showing the investments from the two investors cited amounting to $400,000.  (BK Record, Doc. 54 at 12.)  Plaintiffs have not countered this evidence.  There is, then, sufficient evidence on the record such that a reasonable trier or fact could hold for the Defendants on the issue of the premature release of Plaintiffs' funds.

> **5. Statement in the PPM that implied that True Imaging had separate legal counsel, but rather the attorney who authored the PPM represented the Hogles in their individual capacity.**

The bankruptcy court held that the Hogles led Plaintiffs to believe that True Imaging had separate counsel while in fact the PPM was prepared by an attorney representing only the Hogles' interests.  (Id at 13.)  There is only one section in the PPM regarding legal counsel and it is this section of the PPM that is relied on by the bankruptcy court in this holding.  It reads:

> Legal counsel to the Company may represent the Company and its Manager after the consummation of this Offering. Such counsel has not acted independently on behalf of the investors. Each investor must rely upon his own legal counsel for advice in connection with an investment in the Company.

(*Id.* at 13.) This section clearly states that legal counsel *may* represent Company (True Imaging) *after* consummation of the securities offering. It makes no promise that legal counsel was ever being retained to represent the True Imaging, and does not imply that counsel for True Imaging was hired *prior* to the securities offering. There is no reasonable basis on which an investor could read this section and think that True Imaging was represented by separate legal counsel at the time of the securities offering. Indeed, investors were even specifically warned to seek their own counsel in connection with this investment. There is no basis for summary judgment for material misrepresentation on this issue.

## CONCLUSION

For the reasons above, the summary judgment entered by the Bankruptcy Court is vacated and the case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

Dated this 12th day of February, 2014.

_____
G. Murray Snow
United States District Judge